**2013-5029**

# United States Court of Appeals for the Federal Circuit

HARRY TEMBENIS and GINA TEMBENIS,
administrators of the estate of ELIAS TEMBENIS, deceased,

*Petitioners-Appellees,*

*v.*

SECRETARY OF HEALTH AND HUMAN SERVICES,

*Respondent-Appellant.*

*Appeal from the United States Court of Federal Claims in Case No.
03-VV-2820, Senior Judge James F. Merow.*

## BRIEF FOR PETITIONERS-APPELLEES

RONALD C. HOMER
rhomer@ccandh.com
CONWAY, HOMER & CHIN-CAPLAN, P.C.
16 Shawmut Street
Boston, MA 02116
Phone: (617) 695-1990
Fax: (617) 695-0880

*Counsel for Appellees*

MAY 9, 2013

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

HARRY TEMBENIS v SECRETARY OF HEALTH AND HUMAN

No. 2013-5029

## CERTIFICATE OF INTEREST

Counsel for the Appellees, Harry and Gina Tembenis, certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

> Harry Tembenis and Gina Tembenis,
> administrators of the estate of Elias Tembenis

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Kevin P. Conway, Sylvia Chin-Caplan,
> Joseph M. Pepper, Ronald C. Homer,
> Conway,Homer & Chin-Caplan, P.C.

May 9, 2012                          /s/ Ronald C. Homer
                                     Counsel for Appellees

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ....................................................................iv

I.     STATEMENT OF RELATED CASES ...........................................1

II.    COUNTER-STATEMENT OF THE ISSUE ...................................2

III.   STATEMENT OF THE CASE.......................................................2

    A.     Nature of the Case .............................................................2

    B.     Proceedings to Date............................................................2

    C.     The Statutory Scheme – The Vaccine Act ............................4

        1.     Introduction...............................................................4

        2.     Legislative History....................................................4

        3.     The Remedial Nature of the Vaccine Program Supports the Petitioner's Proposition........................................6

IV.    STATEMENT OF FACTS ...........................................................8

V.     SUMMARY OF THE ARGUMENT ..............................................9

VI.    ARGUMENT:  THE RESPONDENT-APPELLANT'S BASES OF APPEAL AND THE PETITIONERS-APPELLEES' RESPONSES ..........13

    A.     The Respondent-Appellant Argues That the Court of Federal Claims   Committed Legal Error in Approving An Award of Lost Future Earnings to the Estate of A Child Who Died As A Result of His Vaccine-Related Injury .................................13

        1.     The Petitioners-Appellees' Response ......................14

B. The Respondent-Appellant Argues That the Secretary's Interpretation Is Consistent With *Zatuchni* and *Edgar* ......................27

  1. The Respondent-Appellant Argues That *Zatuchni* Does Not Address How The Death Of A Petitioner Affects The Determination Of Lost Future Earning Capacity.....................27

   i. *The Petitioners-Appellees' Response* .................................28

  2. The Respondent-Appellant Argues That *Edgar* Does Not Address How To Calculate Lost Future Earnings ..................34

   i. *The Petitioners-Appellees' Response* .................................34

C. The Respondent-Appellant Argues That Because The Secretary's Interpretation of § 300aa-15(a)(3)(b) Is "Plausible," The Doctrine Of Sovereign Immunity Precludes The Award Of Lost Future Earnings To Elias' Estate ....................36

  1. The Petitioners-Appellees' Response ......................................37

VII. CONCLUSION .................................................................40

CERTIFICATE OF SERVICE ..............................................42

CERTIFICATE OF COMPLIANCE......................................44

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*A.H. Phillips, Inc. v. Walling*,
    324 U.S. 490 (1945) ...................................................................6

*Anderson v. Hayes Const., Co.*,
    243 N.Y. 140 (1926) ...................................................................7

*Atchison, Topeka and Santa Fe Railway Company v. Buell*,
    480 U.S. 557 (1987) ...................................................................6

*Block v. Neal*,
    460 U.S. 289 (1983) ...................................................................7

*Bruesewitz v. Wyeth LLC*,
    131 S.Ct. 1068 (2011).................................................................4

*Burch v. Sec'y of HHS*,
    No. 99-946V, 2010 WL 1676767
    (USCFC Spec. Mstr. Apr. 2010) ...............................................39

*Cloer v. Sec'y of HHS*,
    654 F.3d 1322 (Fed. Cir. 2011) ..........................................25, 35

*Cloer v. Sec'y of HHS*,
    675 F.3d 1358 (2012) ...............................................................39

*Cosmopolitan Shipping Co., Inc. v. McAllister*,
    337 U.S. 783 (1949)...................................................................6

*Edgar v. Sec'y of HHS*,
    989 F.2d 473 (1993) ..........................................................*passim*

*Figueroa v. Sec'y of HHS*,
    __ F.3d __ , 2013 WL 1811018 (Fed. Cir. 2013)........................33, 35, 36, 39

*Foulk v. Sec'y of HHS*,
No. 90-4016V, 1993 WL 189960
(USCFC Spec. Mstr. May 1993) ...................................................................35

*Griglock v. Sec'y of HHS*,
687 F.3d 1371 (2012) ................................................................28, 29, 30

*Hall v. United States*,
677 F.3d 1340 (2012) ................................................................ 3-4

*In re Town & Country Home Nursing Services, Inc.*,
963 F.2d 1146 (9th Cir. 1991) ...................................................7

*Johns-Manville Corp. v. United States*,
855 F.2d 1556 (Fed. Cir. 1988) ...............................................14

*McAllister v. Sec'y of HHS*,
70 F.3d 1240 (1995) ................................................................13, 18

*Norfolk Dredging Co. v. United States*,
375 F.3d 1106 (2004) ...............................................................3

*Richlin Security Service Co. v. Chertoff*,
553 U.S. 571 (2008).................................................................12, 39, 40

*Sarver v. Sec'y of HHS*,
No. 07-307V, 2009 WL 8589740
(USCFC Spec. Mstr. Nov. 2009).................................................19

*Sharp v. United States*,
580 F.3d 1234 (Fed. Cir. 2009) .............................................10, 14

*Stotts v. Sec'y of HHS,*
23 Cl.Ct. 352 (1991) ................................................................22, 31

*United States v. Aetna Casualty & Surety Co.*,
338 U.S. 366 (1949).................................................................7

*United States v. Article of Drug Bacto-Unidisk*,
   394 U.S. 784 (1969)..............................................................................6

*United States v. Gonzales*,
   520 U.S. 1 (1997)...........................................................................10, 14

*United States v. Shaw*,
   309 U.S. 495 (1940)..............................................................................7

*Urie v. Thompson*,
   337 U.S. 163 (1949)..............................................................................6

*Zatuchni v. Sec'y of HHS*,
   516 F.3d 1312 (Fed. Cir. 2008) .........................................................*passim*

## STATUTES AND RULES

**Food, Drug and Cosmetic Act of 1938
(located at 21 U.S.C. § 301 (1994)(as amended)** ....................................6

**The Vaccine Act (located at 42 U.S.C. § 300aa - 1 *et. seq.*)**

   § 10(a)...............................................................38

   § 11(a)(2)......................................................... 7, 38

   § 11(b)(1)(A)....................................................... 30

   § 13(b)(1) ....................................................10, 13, 18

   § 13(b)(1)(B) ....................................................... 10

   § 14(a) .............................................................. 17

   § 15(a)..........................................................*passim*

   § 15(a)(1)(B) ................................................... 3, 9, 40

   § 15(a)(2)................................................. 3, 9, 10, 29, 40

§ 15(a)(3)(B). . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 15(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 11, 40

§ 16(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

§ 16(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

§ 21(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§ 21(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..7

**Legislative History**

H.R. Rep. No. 99-908, 99th Congress, 2nd Session (1986). . . . . . . . 5, 21, 25

H.R. Rep. No. 908, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6375. . . . . . . .. 38

H.R. Rep. No. 106-977, 106th Congress, 2nd Session (2000). . . . . . . . . 7, 13

Joint Committee on Taxation, *Issues Arising in the Determination
of an Appropriate Funding Source for the National Vaccine
Injury Compensation Program* (JCS-4-87), March 5, 1987. . . . . . . . . . . 37

## OTHER AUTHORITIES

22A Am. Jur. 2d Death § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Black's Law Dictionary, 5th ed. (1979). . . . . . . . .. . . . . . . . . . . .16, 32, 33

Black's Law Dictionary, 9th ed. (2009). . . . . . . . . . . . . . . . . . . . . . . . 16

Eskridge, Jr., W. N., Ferejohn, J., *Super-statutes,*
50 DUKE L.J. 1215 (1996). . . . . . . . . . . . . . . . . . . . .. . . . . . . . . .6

Restatement (Second) of Torts § 924 (1979) . . . . . . . . . . . . . . . . . . 16

Restatement (Second) of Torts § 925 (1979) . . . .. . . . . . . . . . . 16, 23

Speiser S. et. al., RECOVERY FOR WRONGFUL DEATH
  § 6:52 - 56 (4th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32

*Stein's Treatise on Personal injury Damages*
§ 3.53 (3rd ed. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

U.S. General Accounting Office Report B-281968 . . . . . . . . . . . . . . . . 26

Vaccine Injury Compensation Trust Fund, *available at*
http://www.treasurydirect.gov/govt/reports/tfmp/vaccomp/vaccomp.htm ...27

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

2013-5029

**HARRY TEMBENIS** and **GINA TEMBENIS,**
administrators of the estate of **ELIAS TEMBENIS,** deceased,

Petitioners-Appellees,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES**,

Respondent-Appellant.

Appeal from the United States Court of Federal Claims in case no.
03-VV-2820, Senior Judge James F. Merow.

**BRIEF FOR PETITIONERS-APPELLEES**

## I.     STATEMENT OF RELATED CASES

No appeal of this case has been before any other court.  To the knowledge of

the Petitioners-Appellees, no related cases are pending in this or in any other court.

## II.    COUNTER-STATEMENT OF THE ISSUE

Whether the U.S. Court of Federal Claims properly applied 42 U.S.C. § 15(a)(3)(B)[1] in awarding compensation for a deceased minor vaccinee's impaired earning capacity.

## III.    STATEMENT OF THE CASE

### A.    Nature of the Case

The Petitioners-Appellees assert that the plain language of § 15(a)(3)(B) directs that an award of compensation be made to Elias Tembenis' ("Elias") estate for his lost earning capacity.  They also assert that Federal Circuit precedent supports such an award.

### B.    Proceedings to Date

On December 16, 2003, the petitioners, Harry and Gina Tembenis ("Harry and Gina") filed a petition for compensation in the National Vaccine Injury Compensation Program on behalf of their son, Elias Tembenis.  A48.  On November 17, 2007, during the pendency of the claim, Elias died.  A54. Thereafter, the Special Master found that the Diphtheria-Tetanus-acellular-Pertussis ("DTaP") vaccine Elias had received on December 26, 2000 was the legal cause of his epilepsy and untimely death.  A65.  In determining an appropriate

---

[1]  The Vaccine Act, which established the Vaccine Injury Compensation Program, is located at 42 U.S.C. §§ 300aa-1 *et. seq*.  For convenience, future references will be to the "Vaccine Act," the "Act" or the "Vaccine Program."  Individual sections to the Act will include only the section number.

amount of compensation, the parties agreed that the petitioners were entitled to a total of $175,000 for Elias' pain and suffering and past unreimbursible expenses, pursuant to § 15(a)(4) and § 15(a)(1)(B) respectively. A3. The parties also agreed that the petitioners were entitled to the $250,000 death benefit pursuant to § 15(a)(2). A3. However, the parties disagreed as to whether the petitioners were entitled to compensation for Elias' impaired earning capacity, pursuant to § 15(a)(3)(B). A3. Thereafter, on October 26, 2011, the Special Master ruled that Elias' estate was entitled to compensation for his impaired earning capacity. A69. The Special Master stated:

> The Circuit has indicated that all the forms of compensation set forth in § 15(a) are available in the case of a deceased petitioner, and the statute specifically provides in section 15(a)(3)(B) for compensation to minor children. See Zatuchni, 516 F.3d at 1322 (stating 'that recovery under § 300aa-15(a)(1) through 4 is permitted' following the death of the vaccinee). On its face, the statute does not discriminate between stricken vaccines who die as children and those who perish in adulthood. . . .In sum, the plain language of section 15(a)(3)(B), in addition to the decisions in Zatuchni and Edgar, forecloses the interpretation advocated by the Secretary.

A70, 73.

On October 19, 2012, the Court of Federal Claims affirmed the Special Master's Decision. A6. Senior Judge Merow stated, "As the language of section 15(a)(3)(B) '[i]s clear and fits the case, the plain meaning of the statute will be regarded as conclusive.'" A6 (citing *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004); *Hall v. United States*, 677 F.3d 1340, 1345 (Fed.

Cir. 2012).   The petitioners were ultimately awarded compensation in the total amount of $1,084,955.61.  A6.

### C.    The Statutory Scheme – The Vaccine Act

#### 1.    Introduction

As this Court is aware, in establishing the Vaccine Program, Congress sought to divert civil lawsuits against vaccine manufacturers into a less rigorous, less adversarial, and more fair and generous arena than the existing federal and state tort systems.  Such a Program, Congress hoped, would not only compensate persons injured by vaccines generously and efficiently, but also protect vaccine manufacturers from liability, in an effort to encourage continued production of existing vaccines and the development of new vaccines.  In accordance with its underlying principles, the Vaccine Program has virtually eliminated civil lawsuits against vaccine manufacturers due to its generous compensation scheme.[2]

#### 2.    Legislative History

It is worth repeating Congress' principal findings that required the establishment of the Vaccine Program.  They are:

1.    The availability and use of vaccines to prevent childhood diseases is among the Nation's top public health priorities;

---

[2]  In *Bruesewitz v. Wyeth LLC,* the Supreme Court observed that 99.8% of successful Vaccine Program compensation claimants have accepted their awards, foregoing any tort remedies against vaccine manufacturers (J. Breyer, concurring,). 131 S.Ct. 1068, 1085 (2011).

2.      The Federal government has the responsibility to ensure that all children in need of immunization have access to them *and to ensure that all children who are injured by vaccines have access to sufficient compensation for their injuries;* and

3.      Private or non-governmental activities have proven inadequate in achieving either of these goals. . . .

H.R. Rep. No. 99-908, 99th Cong., 2d Sess., page 5 (1986) (emphasis added).

In sum, Congress stated, "Thus, two overriding concerns have led to the development of this legislation:

(a)     the inadequacy–from both the perspective of vaccine-injured persons as well as vaccine manufacturers–of the current approach to compensating those who have been damaged by a vaccine; and

(b)     the instability and unpredictability of the childhood vaccine market. . . ."

*Id*. at 7.

To remedy these concerns, the Vaccine Program was established. Congress hoped the Vaccine Program would lessen the number of lawsuits against manufacturers. In so doing, it hoped the Vaccine Program would promote the "development of both new and improved vaccines. . . ." *Id*. at 4. It also hoped it would help to create "a new system for compensating individuals who have been injured by immunizations routinely administered. . . ." *Id*. at 3. Such awards, Congress intended, "can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908 at 3.

5

### 3.   The Remedial Nature of the Vaccine Program Supports the Petitioner's Proposition

The Vaccine Act is a "super-statute,"[3] remedial in nature, one that must be broadly construed to achieve Congressional goals.[4]   In this regard, Congress intended that the Vaccine Program supplant the civil tort system for vaccine injuries, and contemplated that the Vaccine Program be *more generous*, not more parsimonious, than the civil tort system.   Congress intended that vaccine cases resolve *in* the Program, rather than in a civil tort action against a vaccine

---

[3]  A super-statute is one that "seeks to establish a new normative or institutional framework for state policy."  Eskridge, Jr., W. N., Ferejohn, J., *Super-statutes,* 50 DUKE L.J. 1215, 1216 (1996).  Such statutes "stick in the public culture" and have "a broad effect on the law."  *Id.* at 1216.  They are enacted "only after lengthy normative debate about a vexing social or economic problem."  *Id*.  As such, "super-statutes should be construed liberally. . .[and] in light of the statutory purpose and principle. . . ."  *Id*. at 1247.  An example of a super-statute that, like the Vaccine Act, intends to protect the public health is the Food, Drug and Cosmetic Act of 1938, 21 U.S.C. § 301 (1994) (as amended).  The Supreme Court ruled this statute must be given "a liberal construction consistent with [its] overriding purpose to protect the public health."  *United States v. Article of Drug Bacto-Unidisk*, 394 U.S. 784, 798 (1969).

[4]  It is axiomatic that remedial statutes are broadly construed to ensure Congressional intent is satisfied.  *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (For a court to do otherwise, would "abuse the interpretive process and . . .frustrate the announced will of the people"); *Cosmopolitan Shipping Co., Inc. v. McAllister*, 337 U.S. 783, 790 (1949) (The Jones Act, "as welfare legislation. . .is entitled to a liberal construction to accomplish its beneficent purposes"); *Atchison, Topeka and Santa Fe Railway Company v. Buell*, 480 U.S. 557, 562 (1987) (Federal Employer's Liability Act "is a broad remedial statute, and [we] have adopted a 'standard of liberal construction in order to accomplish [Congress'] objects.'   [citing] *Urie v. Thompson*, 337 U.S. 163, 180 (1949).").

manufacturer.[5]  In *United States v. Shaw*, the Supreme Court held that once

Congress has given authority (*i.e.* waived immunity and established jurisdiction),

this authority must be "liberally construed."  309 U.S. 495, 501 (1940).  Also, in

*Block v. Neal*, the Court stated, "[T]he exemption of the sovereign from suit

involves hardship enough where consent has been withheld.  We are not to add to

its rigor by refinement of construction where consent has been announced."  460

U.S. 289, 298 (1983) (quoting Justice Cardozo in *Anderson v. Hayes Const., Co.*

243 N.Y. 140, 147 (1926)); *see also United States v. Aetna Casualty & Surety Co.*,

338 U.S. 366, 383 (1949), and *In re Town & Country Home Nursing Services, Inc.*,

963 F.2d 1146, 1151 (9th Cir. 1991) ("It is well established that when the federal

government waives its immunity, the scope of the waiver is construed to achieve

its remedial purpose.").  Indeed, the House Committee on Government Reform

stated, "The committee is concerned that the doctrine [of sovereign immunity]

should be applied in an appropriate manner, consistent with the remedial purposes

of the [Vaccine] Act."  H.R. Rep. No. 106-977, 106th Cong., 2d Sess., page 14

(2000).

---

[5]  Although vaccine-injured persons are legally required to initially file their claims
in the Program (§ 11(a)(2)), they may withdraw from the Program after specified
time periods (§ 21(b)) or may reject the Vaccine Program judgment and elect to
file a civil action.  § 21(a).

## IV.    STATEMENT OF FACTS

On December 26, 2000, Elias received a DTaP vaccine.  A48.  That evening,

Harry and Gina were awoken by a strange noise coming from Elias' baby monitor.

A52.  They quickly realized he was having a seizure, and rushed to the Emergency

Room in the early morning hours of December 27, 2000.  A52.  The Emergency

Room ("ER") medical record noted he was cyanotic and actively seizing.  A52.

The record states:

> 4 mo[nth] old - got his 4 mo[nth] shots [at] PCP office today, acting
> normally [at] home, presented to ED blue after 10 min[utes] of
> seizures [at] home. [Oxygen] in ED and rectal Valium. . . .total
> seizures time 15 min[utes], all extrem[ities] involved, resolved with
> posturing of [right upper extremities]/[right lower extremities].
> S[eizures] restarted 5 min[utes] later [with] apnea.

A22.

Over the next several years, Elias continued to have regular seizures, and he

was diagnosed with a seizure disorder.  A26.  Elias was also diagnosed with

Pervasive Developmental Disorder ("PDD") and developmental delay.  A53.

Thereafter, on November 16, 2007, Elias was admitted to the ER for status

epilepticus.  A36.  Due to his cardiovascular instability and status epilepticus, Elias

underwent an operation for the "[p]lacement of right femoral percutaneously

inserted 4 French double lumen central venous catheter."  A36.  Unable to recover,

Elias was pronounced dead on November 17, 2007 at 12:26 p.m.  A36.  Elias'

8

death certificate noted multi-system organ failure, cardiac arrest, and seizure disorder as causes of death.  A37.

## V.    SUMMARY OF THE ARGUMENT

Elias received a DTaP vaccine on December 26, 2000.  A48.  Shortly thereafter, he developed a seizure disorder, which ultimately led to his untimely death on November 17, 2007.  A65.  The Special Master has found, and there is no dispute, that Elias' seizure disorder and death were a direct result of his December 26, 2000, DTaP vaccination.  A65.  There is also no dispute that Elias' estate is entitled to compensation for past unreimbursible expenses provided by § 15(a)(1)(B), Elias' pain and suffering pursuant to § 15(a)(4), and the death benefit provided by § 15(a)(2).  A3.  The Respondent-Appellant denies, however, that Elias' estate is entitled to compensation for Elias' impaired earning capacity provided by § 15(a)(3)(B).  A69.  In the respondent's view, contrary to the opinions of the Special Master and the Court of Federal Claims, the plain language of the Vaccine Act precludes such an award.  Respondent-Appellant's Brief, page 9.[6]  Harry and Gina argue that the plain language of the Vaccine Act supports an award of compensation for a deceased minor's impaired earning capacity.  As the Federal Circuit has stated, "Where the intent is unambiguously expressed by the plain meaning of the statutory text, we give effect to that clear language without

---

[6]  Hereafter, "Resp. __."

rendering any portion of it meaningless." *Sharp v. United States*, 580 F.3d 1234, 1237 (Fed. Cir. 2009) (citing *United States v. Gonzales*, 520 U.S. 1, 4 (1997)).

The respondent also argues that the Special Master improperly calculated Elias' impaired earning capacity by not contemplating his death as a factor. Resp. 10. However, the Special Master *did* consider the fact of Elias' death. Pursuant to § 13(b)(1), a special master must consider "the course of the injury, disability, illness, or condition until the date of the judgment. . . ." *See* § 13(b)(1)(B). In this regard, because Elias' death was a *sequela* of his vaccine-injury, the fact that he died is relevant to the determination of the severity of his injury under § 15(a)(3)(B).

The Respondent-Appellant contends that Congressional intent behind an award for impaired earning capacity is to provide only for the impaired earning capacity of a vaccine-injured *living* person in order to "help the claimant maintain a reasonable standard of living." Resp. 10, 20. No support is provided for this proposition. The Respondent-Appellant similarly contends that such an award, to the decedent's survivors, is not authorized under the Act. Resp. 10-11. However, an award of compensation for impaired earning capacity in the instant case is no different than an award for the other items of compensation included in § 15(a); it is provided to Elias' estate. The Respondent-Appellant does not contest the awards to the estate pursuant to § 15(a) (1) (past medical expenses), § 15(a)(2) (death

10

benefit), and § 15(a)( 4) (pain and suffering).   The Respondent-Appellant only

contests the appropriateness of an award pursuant to § 15(a)(3)(b) (impaired

earning capacity).   Clearly, Congress intended that the estate of a vaccine-injured

minor, who died as a result of a vaccine injury, be awarded all of the benefits listed

in § 15(a)(3)(b).  This approach is consistent with Federal Circuit precedent.  It is

also supported by the text and structure of the Vaccine Act.  In these

circumstances, it is clear that compensation for impaired earning capacity must be

awarded to the estate of a deceased minor vaccinee.  Contrary to the Respondent-

Appellant's assertions, such an approach is also consistent with traditional tort

principles.

The Respondent-Appellant argues that the government's position is fully

compatible with *Zatuchni v. Secretary of HHS*, 516 F.3d 1312 (Fed. Cir. 2008),

and *Edgar v. Secretary of HHS*, 989 F.2d 473 (Fed. Cir. 1993).  Resp. 11.  The

petitioners, Harry and Gina, disagree.  The Federal Circuit in *Zatuchni* held, where

a petition has been properly filed, all categories of compensation provided in §

15(a) are available to deceased as well as living petitioners.  *Zatuchni*, 516 F.3d at

1318.  In *Edgar*, this Court stated that "[N]othing in section 2115(a)(3)(B) permits

the compensation award to be contingent upon the child reaching age 18."  *Edgar*,

989 F.2d at 477.  Taken together, it is binding Federal Circuit precedent that both

deceased and living petitioners are entitled to all of the compensation provided

11

under § 15(a), and an award of compensation pursuant to § 15(a)(3)(B) cannot be

contingent on the minor reaching age 18.  The Respondent-Appellant's

interpretation is patently inconsistent with this precedent.

Finally, the Respondent-Appellant argues that the government's

interpretation is, at least, plausible.  Resp. 12.  Consequently, because of the

doctrine of sovereign immunity, this interpretation must be adopted.  *Id*.  First, the

Petitioners-Appellees disagree that the Vaccine Act is a waiver of sovereign

immunity because the United States is not consenting to be sued.  Rather, the

Vaccine Act created a compensation program, with all costs being borne by the

Vaccine Injury Compensation Trust Fund, not the general treasury.  In any event,

the Respondent-Appellant's interpretation is not plausible because it is contrary to

the text and structure of the Vaccine Act.  Moreover, as the Supreme Court

recently noted, "The sovereign immunity canon is just that – a canon of

construction.  It is a tool for interpreting the law, and we have never held that it

displaces the other traditional tools of statutory construction." *Richlin Security*

*Service Co. v. Chertoff*, 553 U.S. 571, 128 S.Ct. 2007 at 2019, 170 L.Ed.2d 960

(2008).  In this case, the canon of sovereign immunity does not dictate that this

Court is bound to accept the respondent's interpretation even if it were plausible.

Indeed, it was Congress' intent that the canon of sovereign immunity not be used

to frustrate the remedial purpose of the Vaccine Act.  *See* H.R. Rep. No. 106-977,

2000 WL 1517012 at 14 (2000).

## VI.   ARGUMENT:  THE RESPONDENT-APPELLANT'S BASES OF APPEAL AND THE PETITIONERS-APPELLEES' RESPONSES

The Respondent-Appellant asks this Court to reverse the decision of the

Court of Federal Claims and to deny Elias' estate compensation for his impaired

earning capacity.  The Petitioners-Appellees respectfully reply to each of the

Respondent-Appellant's arguments.

### A.   The Respondent-Appellant Argues That The Court Of Federal Claims Committed Legal Error In Approving An Award Of Lost Future Earnings To The Estate Of A Child Who Died As A Result Of His Vaccine-Related injury

The Respondent-Appellant argues that the plain text of § 15(a)(3)(B)

precludes an award for Elias' impaired earning capacity.  Resp. 13.  The

Respondent-Appellant further argues that application of § 13(b)(1) and the Federal

Circuit's holding in *McAllister v. Secretary of HHS*, 70 F.3d 1240 (Fed. Cir. 1995),

would disallow such an award, and that this result would be in accord with

traditional tort principles.  Resp. 16-18.  Finally, Respondent-Appellant argues that

an award for Elias' impaired earning capacity would not be consistent with the

underlying purpose of the Vaccine Act.  Resp. 19.

### 1.    **The Petitioners-Appellees' Response**

Section 15(a)(3)(B) is unambiguous.  It states that compensation for

impaired earning capacity *shall be* available to the estate of a deceased petitioner.

The Federal Circuit has indicated that, "[A]bsent a very clear legislative intent, the

plain meaning [of the statute] will prevail."  *Johns-Manville Corp. v. United States*,

855 F.2d 1556 (Fed. Cir. 1988).  Further, "Where the intent is unambiguously

expressed by the plain meaning of the statutory text, we give effect to that clear

language without rendering any portion of it meaningless."  *Sharp v. United States*,

580 F.3d 1234, 1237 (Fed. Cir. 2009) (citing *United States v. Gonzales*, 520 U.S. 1,

4 (1997)).

Section 15(a)(3)(B) of the Vaccine Act states that compensation in the

Vaccine Program *shall* include the following:

> In the case of any person who has sustained a vaccine-related injury
> before attaining the age of 18 and whose earning capacity is or has
> been impaired by reason of such person's vaccine-related injury for
> which compensation is to be awarded and whose vaccine-related
> injury is of ***sufficient severity*** to permit reasonable anticipation that
> such person is likely to suffer ***impaired earning capacity*** at age 18
> and beyond, compensation after attaining the age of 18 for loss of
> earnings determined on the basis of the average gross weekly earnings
> of workers in the private, non-farm sector, less appropriate taxes and
> the average cost of a health insurance policy, as determined by the
> secretary.

§ 15(a)(3)(B)(emphasis added).

14

As the Court of Federal Claims correctly decided, the meaning of this provision is plain and unambiguous.  A6.  The Court stated, "[S]ection 15(a)(3)(B) plainly states that a vaccinee's injury, serious enough so that it could be anticipated to cause impaired earning capacity at age 18 and beyond, calls for recovery of compensation for lost earnings."  A5.  As an initial matter, the statute makes clear that § 15(a)(3)(B) applies to "*any person* who has sustained a vaccine-related injury before attaining the age of 18."  § 15(a)(3)(B) (emphasis added).    It does not make a distinction as to whether that person is living or deceased.  Here, it is undisputed that Elias sustained a severe vaccine-injury before the age of 18.  During the following years, Elias endured numerous seizures, which resulted in encephalopathy, developmental delay, and ultimately, his untimely death.

In addition, the plain text of the statute clearly focuses on an individual's "impaired earning capacity" rather than actual lost earnings.  As the Special Master discussed and the Court of Federal Claims affirmed, "The Secretary misconstrues the nature of the loss, which is the present loss of the capacity to earn in the future.  Elias had a certain capacity to earn in adulthood before he was injured by vaccination; after vaccination, that capacity was impaired."  A71.  In this regard, a person's earning capacity is easily distinguished from actual earnings.  If Congress had intended to compensate *actual* lost earnings it could have easily used language to indicate this intention in the statute.  *See* A6, A68.  Instead, Congress used the

15

phrase "impaired earning capacity" to denote what compensation shall be available under § 15(a)(3)(B).  A71.

Lost earning capacity is defined as "A person's diminished earning power resulting from an injury."  *Black's Law Dictionary*, 9th ed. (2009).  At the time when § 15(a)(3)(B) was drafted in 1986, Black's Law Dictionary expressly stated that loss of earning capacity "is not the same as loss of earnings. . . ."  *Black's Law Dictionary*, 5th ed., p. 852 (1979) (emphasis added).  Loss or impairment of earning capacity is a recoverable item of damages in personal injury and wrongful death actions and is not the same as lost future earnings.  *See* Restatement (Second) Torts §§ 924, 925 (1979).  The plain language of the Vaccine Act is unequivocal that Congress sought to compensate a petitioner's *impaired earning capacity* rather than *actual* loss of earnings.  As the Special Master discussed and the Court of Federal Claims affirmed, "The Secretary's interpretation. . .distorts the plain meaning by adding to the words a concept that Congress did not include – the necessity for actual lost earnings."  A5, A68.

The next requirement under § 15(a)(3)(B) is that the vaccine-related injury be of "sufficient severity" to permit reasonable anticipation that such person is likely to suffer impaired earning capacity.  § 15(a)(3)(B).  The respondent agrees that Elias' vaccine-injury was of sufficient severity to impair his earning capacity.  A74. The Respondent-Appellant, however, fails to acknowledge the most

16

significant *sequela* of Elias' vaccine-injury was his death.  The Special Master appropriately discussed the significance of a vaccine-related death following a vaccine-injury, holding, "[A] child who dies as the result of vaccination, based on the severity of his vaccine-related injury, is entitled to 100% compensation for future lost wages, not 0[%]."  A72.  This result recognizes a vaccine-related death to be a *sequela* of the preceding vaccine-injury.  Indeed, the Vaccine-Injury Table; one of the central features of the Vaccine Act, contemplates death as a recognized sequela of a vaccine-injury.[7]  Alternatively, the Special Master indicated that where the death was unrelated to the vaccination, "the amount of compensation would reflect the severity of the vaccine-related injury."  A72.

The final requirement of § 15(a)(3)(B), "at age 18 and beyond," was appropriately classified by this Court in *Edgar v. Secretary of HHS* as, simply, "a factor to be applied in calculating the total compensation for lost earnings. . . .Once lost earnings are calculated using this factor. . .nothing in section 2115(a)(3)(B) permits the compensation award to be contingent upon the child reaching age 18." *Edgar*, 989 F.2d at 477.  Simply stated, the Vaccine Act contemplates that compensation for a minor's impaired earning capacity shall be calculated using age 18 as the starting year.

---

[7]  In multiple instances, under the heading "Illness, Disability, Injury or Condition Covered," the Vaccine-Injury Table reads, "Any acute complication or sequela (*including death*) of an illness, disability, injury, or condition referred to above . . . ." *See* § 14(a).

Citing *McAllister v. Secretary of HHS* and § 13(b)(1), the Respondent-
Appellant reads § 15(a)(3)(B) as <u>*requiring*</u> that the Court have a reasonable
anticipation that the petitioner will have an *actual* loss of earning capacity *after* age
18.  Resp. 17.  The Respondent-Appellant argues:

> Here, Elias had died by the time the special master determined his
> entitlement to compensation for lost earnings, yet the special master
> calculated lost future earnings based only upon the information that
> existed at the time Elias was alive and suffering from the seizure
> disorder.  Only in this manner could the special master have
> 'anticipate[d]' that Elias would suffer a loss of earning capacity at age
> 18. . . .The special master failed, then, to take into account the 'change
> in the victim's condition. . . .prior to the date of the final calculation of
> the award,' as §300aa-13(b)(1) and *McAllister* require.

*Id*.

As discussed *supra*, the Special Master did consider the fact of Elias' death
when determining compensation for his impaired earning capacity.  *See* A72.  In
this regard, because Elias' death is a *sequela* of his vaccine-injury, it is relevant to
the severity of his injury.  The Respondent-Appellant refuses to acknowledge the
fact that Elias' death is a *sequela* of his vaccine-injury and is therefore relevant to
the injury's severity.  Rather, this "change in the victim's condition", the Secretary
argues, relates only to whether the Court can anticipate that Elias would *actually*
incur lost earnings at age 18 and beyond.  *See* Resp. 17.  This interpretation of the
Vaccine Act adds a requirement of actual lost earnings that is not contemplated by
the plain language of the statute nor binding precedent.  *See* A5, A68.

18

Accordingly, the manufactured requirement of actual lost earnings is precluded by any plausible interpretation of the Vaccine Act.

The Respondent-Appellant relies heavily on a special master's s opinion in *Sarver v. Secretary of HHS*, No. 07-307V, 2009 WL 8589740 (USCFC Spec. Mstr. Nov. 16, 2009). In *Sarver*, the Special Master wrote, "What is required is that the special master reasonably anticipate, when making his (or her) decision about damages, that the person is likely to be alive at age 18 and beyond." *Sarver*, No. 07-370V at 10.[8]  This dubious requirement confuses the plain language of § 15(a)(3)(B) and places heightened importance on the phrase "at age 18 and beyond." The Special Master in the instant case correctly determined that this interpretation is not plausible, stating:

> [Section 15(a)(3)(B)] incorporates, in the following order, the concepts of 'earning capacity,' vaccine-related injury,' 'sufficient severity,' and 'reasonable anticipation' of a loss of 'earning capacity at age 18 and beyond[.]'  If these concepts are put together in the order promulgated by Congress, the sentence cannot be read in the way the Secretary has construed it: to permit compensation only for actual lost earnings at and beyond age 18. . . .In sum, the plain language of section 15(a)(3)(B), in addition to the decisions in

---

[8]  The Court in *Sarver v. Secretary of HHS*, stated, "Paraphrasing the statute slightly, the statute indicates that the special master must reasonably anticipate that the injured person will suffer an impaired earning capacity at age 18." *Sarver*, No. 07-370V at 9.  The special master thus determined that where a minor petitioner has died and will never reach age 18, there can be no *actual* impaired earning capacity at age 18, and thus no concomitant award.  This holding forgets the plain language of the statute as well as binding Federal Circuit precedent.  Moreover, a special master does not have the authority to "paraphrase the statute slightly."

Zatuchni and Edgar, forecloses the interpretation advocated by the Secretary.

A73.

As acknowledged by the Special Master, this issue has also been addressed by the Federal Circuit in *Edgar v. Secretary of HHS*. In *Edgar*, the petitioner was a minor who, after a tetanus booster and an oral polio vaccination, became comatose. The petitioner remained alive, but was entirely dependent on hospital staff for her continued well-being. During the damages phase of her case, the respondent offered an annuity to provide compensation for the petitioner's lost earning capacity. The annuity contained two conditions: (1) no payments would be made if the petitioner died before reaching age 18; and (2) payments would cease on the petitioner's death even if the petitioner was older than age 18. *Edgar*, 989 F.2d at 475. Ultimately, the Federal Circuit held:

> [T]he Secretary argues that. . .section 2115(a)(3)(B) only provides for 'compensation after attaining the age of 18.' The Secretary misinterprets this section. **Section 2115(a)(3)(B) simply prescribes a factor to be applied in calculating the total compensation for lost earnings, i.e., it must be presumed that an injured child will not begin working until age 18. Once lost earnings are calculated using this factor, however, nothing in section 2115(a)(3)(B) permits the compensation award to be contingent upon the child reaching age 18. In addition, nothing in section 2115(a)(3)(B) authorizes the amount of compensation to be contingent upon the actual, post-injury life of the injured child**.

*Edgar*, 989 F.2d at 477 (emphasis added).

The Federal Circuit clearly states that § 15(a)(3)(B) does *not* limit

compensation for impaired earning capacity to those cases where there is a

reasonable anticipation that the petitioner will *survive* to age 18 and beyond.  As

the Special Master correctly found, the Federal Circuit interprets the phrase "at age

18 and beyond" as simply providing a factor to apply in the calculation for lost

earning capacity.  A73.  If the respondent's interpretation is utilized, in those cases

where the evidence shows that a vaccine-injured minor will, more likely than not,

die before reaching age 18, compensation for impaired earning capacity would

necessarily  be denied, even where the petitioner was still alive at judgment.  Thus,

the Respondent-Appellant's interpretation would undoubtedly result in more

litigation by encouraging petitioners to reject the Vaccine Program's award and file

a civil action.  This is contrary to Congressional intent that the Vaccine Program

avoid civil litigation and compensate "vaccine-injured persons quickly, easily, and

with certainty and generosity."  H.R. Rep. No. 99-908 at 3.  Moreover, nowhere in

the statute or in practice is it required to show by a preponderance of the evidence

that a particular petitioner will survive past age 18.  A72.[9]  In fact, the Federal

Circuit has held, "[N]othing in section 2115(a)(3)(B) permits the compensation

---

[9]  The Special Master correctly held, "Historically, many children in the Vaccine
Program have received compensation for lost earnings without a finding that the
victim actually would survive to age 18, and without the Secretary even contending
that actual survival to that age was an issue."  A72.

award to be contingent upon the child reaching age 18." *Edgar v. Sec'y of HHS*, 989 F.2d 473, 477 (Fed. Cir. 1993). Indeed, if the child were to be denied this benefit, then survive past his or her 18th birthday, the child would not be able to return for additional compensation. Certainly, Congress never intended such a parsimonious result.

Even when a petitioner has died from his vaccine-injury, his loss of earning capacity is tangible. As the Special Master noted, "The Secretary misconstrues the nature of the loss, *which is the present loss of the capacity to earn in the future*. Elias has a certain capacity to earn in adulthood before he was injured by vaccination; after vaccination, *that capacity was impaired*." A71. In addition, in *Stotts v. Secretary of HHS*, 23 Cl.Ct. 352 (1991), the Court of Federal Claims stated:

> Under the plain language of § 300aa-15(a)(3)(B), one could sensibly argue that the vaccine-related injury being compensated is *loss of earning capacity, not actual loss of earnings*. Section 300aa-15(a)(3)(B) speaks in terms of compensation for impaired earning capacity resulting from a vaccine-injury severe enough to impair earning capacity at age 18 and beyond. Thus, it would seem that the loss of earning capacity could occur after the vaccination, but long before the injured child reaches the age of 18. . . .In this context, therefore, an injured child should be able to receive immediate compensation for a loss (i.e., 'impaired earning capacity') that has already occurred. In fact, one could 'generously' argue that such an individual would be unequivocally entitled to immediate compensation for such actual losses.

*Id*. at 366 n. 13 (emphasis in original).  The plain language of § 15(a)(3)(B) is unambiguous that damages for lost earning capacity be provided to the estate of a minor who died as a result of his vaccine-injury.

The Respondent-Appellant also argues that an award of compensation for Elias' impaired earning capacity is "not compatible with traditional tort principles."  Resp. 18.  The Respondent-Appellant states that, in the majority of states, an estate cannot recover for the impaired earning capacity of a decedent in either a wrongful death action or a survival action.  Resp. 18.  Harry and Gina disagree.  As an initial matter, the Vaccine Program was designed to supplant the state tort system.  Of paramount importance is the plain language of the statute and the underlying Congressional intent – not consistency with traditional tort principles.  Congress, in fact, envisioned the Program to be *more* generous than the traditional tort system in order to facilitate its major policy goals.  *See supra*, pages 5-6.  Regardless, an award of compensation to his estate for Elias' impaired earning capacity is entirely consistent with traditional tort principles.

In all states, the measure of tort damages to a decedent is provided by statute.  *See* 22A Am. Jur. 2d Death § 4.  Because these statutes vary widely, "[t]he measure of damages for causing the death of another depends upon the *wording of the statute* creating the right of action and its interpretation."  *See* Restatement (Second) of Torts § 925 (1979) (citing cases) (emphasis added).  In general,

however, there are two types of statutes; survival statutes and wrongful death statutes. *See Stein's Treatise on Personal Injury Damages* § 3.53 (3rd Ed. 2011). In this regard, the survival statute provides for damages from the date of injury up until death; the wrongful death statute provides for the damages after death. *Id*. These two causes of action are generally joined together in order to provide complete relief to the estate of the victim. *Id*. In most statutory schemes, the full relief includes compensation for the decedent's impaired earning capacity. *Id*. ("[A] substantial part of the compensation to which an injured person is entitled is that for the impairment of his or her future earning capacity."); *see also* Stuart M. Speiser & James E. Rooks, Jr., *Recovery for Wrongful Death* §§ 6:52 – 6:55.[10]

The Respondent-Appellant believes that the Court of Federal Claims' ruling in the instant case will invite subsequent awards for future medical expenses and future pain and suffering to the estates of deceased petitioners. Resp. 19. This argument is specious. Under the plain language of the Act, the estate of a deceased petitioner would properly receive compensation for past expenses and past pain and suffering, consistent also with a state survival statute. Similarly, the estate would receive compensation for the decedent's impaired earning capacity, consistent with a state wrongful death statute. The Vaccine Act's compensation

---

[10] "However, despite the emphasis on decedent's lost earnings and destroyed earning capacity, it is not essential that the decedent be employed or earning income at the time of death. Thus, where the decedent was. . .an infant, the jury may still award substantial damages for the loss to the estate." *Id*. at § 6:56.

24

scheme is wholly consistent with either a state system comprised of separate survival and death statutes, as well as a state system with a combined survival-death statute.

The Respondent-Appellant also argues that the Court of Federal Claims' ruling is inconsistent with the purposes of § 15(a)(3)(B). Resp. 19. In this regard, the Respondent-Appellant argues, the Vaccine Program was designed to supplant the "deterrent effects of the civil tort system." *Id*. In this regard, the respondent-appellant argues, awards in civil actions encouraged, *inter alia*, better vaccine designs. *Id*. at 20. However, the Secretary says, the Vaccine Act "provides other means for achieving" this effect. *Id*. In these circumstances, where deterrence is not a primary goal, the Respondent-Appellant suggests, the only possible purpose of § 15(a)(3)(B) is to provide for a vaccine-injured individual's *living* expenses. *Id*. The Respondent-Appellant points to no support for this proposition.

In fact, the primary purposes of the Vaccine Program are to shield vaccine manufacturers from civil liability for vaccine-related injuries and deaths and also to provide petitioners with an efficient and generous system of compensation. *See* H.R. Rep. 99-908 at 3. Indeed, this Court has stated that, "It is clear that Congress intended the Vaccine Act's compensation program to be *more generous* than the civil tort system." *Cloer v. Secretary of HHS*, 654 F.3d 1322, 1350 (Fed. Cir. 2011) (emphasis added). If the Respondent-Appellant's interpretation of §

25

15(a)(3)(B) is adopted, the Vaccine Program would clearly be *less* generous than the civil tort system.  In this regard, the civil tort system often provides a decedent's estate with compensation for the decedent's impaired earning capacity.  A Vaccine Program that is less generous than the civil tort system would encourage more aggrieved petitioners to use the civil tort system, a result in direct conflict with Congressional intent.

The Respondent-Appellant will also likely argue that such a cause of action would "deplete the Program's Trust Fund."  *See* A70.  In response, a review of a United States General Accounting Office report is instructive.  This report indicates:

> The VICP trust fund has historically received more in vaccine excise taxes than it has paid out for claims and related administrative costs. Since the program began, the Treasury reported it has collected over $1.6 billion in vaccine excise taxes: $.4 billion of this amount went directly to the general fund. . . .The remaining $1.2 billion went to the VICP trust fund for claims payments and related administrative costs. *Because the trust fund has spent only about $290 million of the $1.2 billion received*, the remaining $948 million was loaned to the Treasury. . . .In exchange, the trust fund received Treasury securities . . . .Interest on these Treasuries held by the trust fund totaled about $374 million by the end of fiscal year 1998. . . .*At current rates, the Congressional Budget Office (CBO) estimates that the VICP trust fund balance will reach $2.6 billion within the next decade and the program will generate almost three times more revenue than will be used to pay annual claims and administrative costs.*

U.S. GEN. ACCOUNTING OFFICE:  VACCINE INJURY COMPENSATION – PROGRAM CHALLENGED TO SETTLE CLAIMS QUICKLY AND EASILY, B-281968, 17-18 (1999)

(emphasis added).  As of today, the Vaccine Program's Trust Fund contains

approximately $3.4 billion.[11]

The Special Master correctly stated that the Federal Circuit's decision in

*Zatuchni* "counsels against adoption of the Secretary's policy arguments."  A70.

In response to the respondent's argument that Congress sought to restrict "death"

compensation due to a concern about the "sufficiency of funds," the Special Master

writes, "<u>Zatuchni</u> held to the contrary, based on the express legislative history

indicating that Congress intended that the Act's provisions be administered with

'generosity.'"  A70.

### B.    The Respondent-Appellant Argues That the Secretary's Interpretation Is Consistent With *Zatuchni* and *Edgar*

#### 1.    <u>The Respondent-Appellant Argues That *Zatuchni* Does Not Address How The Death Of A Petitioner Affects The Determination Of Lost Future Earning Capacity</u>

The Respondent-Appellant next argues that *Zatuchni* is inapplicable to the

instant case.  In this regard, the Respondent-Appellant states that the holding in

*Zatuchni* deals only with past lost earnings, past pain and suffering and past

expenses.  Resp. 22.

---

[11]  *See* http://www.treasurydirect.gov/govt/reports/tfmp/vaccomp/vaccomp.htm
(last visited May 8, 2013).

### i.    *The Petitioners-Appelles' Response*

The Federal Circuit Decisions in *Zatuchni* and *Griglock v. Secretary of HHS*[12] dictate that when a petition has been properly filed, *all* compensation provided by § 15(a) of the Vaccine Act *shall* be awarded.  In *Zatuchni*, this Court stated that where a petition has been properly filed, a successful petitioner is entitled to the compensation provided by § 15(a).  The Federal Circuit held:

> Most important, the text and structure of § 300aa-15(a) indicate that the death benefit provided by subsection (a)(2) is not the exclusive remedy where a petitioner has experienced both a vaccine-related injury and a vaccine-related death.  First, subsection [15](a)(2) is not set off from the subsections dealing with compensation for expenses, lost wages, and pain and suffering; to the contrary, it is listed between and alongside those provisions, which supports an interpretation in which the death benefit is simply one of several types of compensation that are available in an appropriate case.  Second, and perhaps most crucially, the text of subsection [15](a) as a whole does not. . .provide any indication that the death benefit in [§ 15](a)(2) is the only compensation that may be paid in a 'death case,'
> . . . .Subsection [15](a) begins with the directive that 'compensation . . .*shall include* the following,' and proceeds to list four categories of available compensation. . . .Thus, it is in no way inconsistent with the text of 42 U.S.C. § 300aa-15(a) to award compensation under subsections (a)(1), (3), and (4) for damages that 'resulted from' or were sustained 'by reason of' a vaccine-related injury in addition to the death benefit provided for under subsection (a)(2)
> . . . .To the contrary, this is the reading of § 300aa-15(a) that most naturally flows from its text and structure.

*Zatuchni*, 516 F.3d at 1318-19.  Thus, the Federal Circuit held that, when a petition has been properly filed, all categories of compensation under § 15(a) *shall be*

---

[12]  687 F.3d 1371 (Fed. Cir. 2012).

available to deceased as well as living petitioners. *Id*. at 1318. Stated another way, the $250,000 death benefit provided by § 15(a)(2) is not the *sole* remedy if a vaccine-related death occurs.

In *Griglock*, the Federal Circuit further clarified Vaccine Program jurisprudence. The petitioner in *Griglock* died prior to filing a petition for compensation. *Griglock*, 687 F.3d at 1373. Subsequently, her estate filed a petition demanding all compensation available under § 15(a). *Id*. at 1373-74. While the petition was properly filed pursuant to § 16(a)(3),[13] it was filed after the expiration of the statute of limitations proscribed in § 16(a)(2).[14] *Id*. at 1374. Consequently, the Court denied compensation for the petitioner's vaccine-injury, stating, "A petition for injury benefits, even if filed by the legal representative of a person who has died as a result of a vaccine, must be filed within the timeline provided for injury benefits. . . ." *Id*. at 1375. Thus, because the petitioner met only the statute of limitations for a petition for "compensation. . .for such death"

---

[13] Section 16(a)(3) provides that "no petition may be filed for <u>compensation under the Program for such death</u> after the expiration of 24 months from the date of the death and no such petition may be filed more than 48 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of the injury from which the death resulted." § 16(a)(2)(emphasis added).

[14] Section 16(a)(2) provides that "no petition may be filed for <u>compensation under the Program for such injury</u> after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." § 16(a)(2) (emphasis added).

(i.e., § 16(a)(3)), compensation for her injuries was denied. *Id*. However, had the petitioner timely filed her petition for "compensation. . .for such injury" (i.e., § 16(a)(2)), she would have been entitled to *all* compensation provided by § 15(a), pursuant to *Zatuchni*. *Id*.

Unlike in *Griglock*, the petition in this case was properly filed pursuant to § 16(a)(2). Therefore, contrary to the Respondent-Appellant's view, Elias' estate is entitled to receive compensation for his vaccine-injury *and* vaccine-related death. This result is mandated by the plain language of the statute as well as the Federal Circuit decisions in *Zatuchni* and *Griglock*. Any contrary interpretation is not plausible. In this regard, one component of the "injury" compensation to which Elias' estate is entitled is compensation for impaired earning capacity pursuant to § 15(a)(3)(B).

As discussed, the Federal Circuit has clearly indicated that all compensation pursuant to § 15(a) *shall* be available to a proper petitioner. *Zatuchni*, 516 F.3d at 1318. The estate in the instant case *is* a proper petitioner pursuant to § 11(b)(1)(A) and § 16(a)(2). The Respondent-Appellant, however, argues that *Zatuchni* did not directly address the issue in this case, because the Court did not address *future* lost earnings. Resp. 22. Again, the plain language of § 15(a)(3)(B) does not address

*future* lost earnings.[15]  The plain language of the statute is clear that Congress

sought to compensate for the impairment of earning capacity.  In this regard, a loss

of earning capacity is *not* an element of future damages.  As the Court in *Stotts*

discussed, impaired earning capacity is tangible and can be measured at the time of

injury.[16]  The impairment to earning capacity exists concomitantly with the other

items of damages enumerated in § 15(a).  Accordingly, the impairment of an

individual's earning capacity is not prospective, nor is the calculation of lost

earnings based on that impairment.  It is an immediate harm.  *See Stotts*, 23 Cl.Ct.

at 366 n.13.  Because the loss or impairment of earning capacity is a tangible

calculation that occurs at the time of injury, it is not an element of future damages

under the Vaccine Act.

The Respondent-Appellant also argues that the justifications for the Court's

holding in *Zatuchni* do not apply here.  Resp. 22.  The Respondent-Appellant

states, "*Past* lost wages and unreimbursible expenses deplete the funds that

become the estate of the individual.  By compensating for them, the estate is made

whole."  Resp. 22 (emphasis in original).  The Respondent-Appellant, thus,

---

[15] The Special Master correctly held, "The Secretary misconstrues the nature of the loss, which is the present loss of the capacity to earn in the future."  A71.

[16]  The Court in *Stotts* stated, "[A]n injured child should be able to receive immediate compensation for a loss (i.e., 'impaired earning capacity') that has already occurred."  *Stotts*, 23 Cl.Ct. at 366 n.13 (emphasis added).

believes a rational justification for an award of compensation is to make the estate whole again. However, Harry and Gina ask, how can Elias' estate be made whole without an award of compensation for his impaired earning capacity? But for his vaccine-injury, which ultimately resulted in his death at age 6, Elias would have had the capacity to work as an adult. This is not disputed by the Respondent-Appellant. *See* A74. The diminution to his estate occurred at the time when his earning capacity was impaired. Moreover, the civil tort system recognizes the impairment of earning capacity is a loss to the estate; a loss that should be compensated. *See* Stuart M. Speiser & James E. Rooks, Jr., *Recovery for Wrongful Death* § 6:52. The Vaccine Program, which supplants the civil tort system; indeed, which is to be more generous than the civil tort system, should be no different.

In this regard, the Respondent-Appellant implicitly argues that *Zatuchni* only addresses damages that have been *incurred*. Resp. 22. This Petitioners-Appellees disagree with this interpretation of *Zatuchni*, and any such discussion is merely dicta.[17] However, even assuming *Zatuchni* does mandate that only incurred damages are recoverable where a vaccine-related death occurred, Elias *had* actually incurred an impaired earning capacity prior to his death. Significantly, the

---

[17] Dicta are the "[o]pinions of a judge which do not embody the resolution or determination of the court. Expressions in court's opinion which go beyond the facts before the court. . .and not binding in subsequent cases." *Black's Law Dictionary*, 5th ed., p. 408 (1979).

concurring opinion in *Zatuchni v. Secretary of HHS* states, "[B]ecause the statutory language does not specify whether claims under the Vaccine Act survive, this issue is properly governed by federal common law, and that claims for vaccine-related injury [compensation] *accruing prior to death* survive the death of a claimant."[18] 516 F.3d 1312, 1331 (Fed. Cir. 2008) (Dyk, J., concurring) (emphasis added).[19] Because Elias' claim for lost earning capacity accrued prior to his death and because the Vaccine Act is a remedial federal statute, his estate is entitled to compensation for his loss of earning capacity.

---

[18] "A cause of action "accrues" when a suit may be maintained thereon . . . .Cause of action "accrues" on date that damage is sustained. . . ." *Black's Law Dictionary*, 5th ed., p. 19 (1979).

[19] In *Figueroa v. Secretary of HHS*, __ F.3d __, 2013 WL 1811018 (Fed. Cir. 2013), this Court stated:

> [I]t is well established that the background rule is that **remedial** claims survive the death of the injured party.  Our law recognizes that '[t]he basic federal rule is that an action for a penalty does not survive, though **remedial** actions do.'. . . .[O]ur sister circuits have likewise reached the conclusion that claims under **remedial** federal statutes survive, even in the absence of an express statutory provision. . . .A petition for compensation under the Vaccine Act is clearly **remedial** . . . .Thus, the presumption is that it survives, in the absence of a statutory provision to the contrary.

*Id*. at *5 (emphasis added).

33

### 2. The Respondent-Appellant Argues That *Edgar* Does Not Address How To Calculate Lost Future Earnings

The Respondent-Appellant next argues that *Edgar* is distinguishable from this case because in *Edgar*, the vaccine-injured individual was alive at Judgment. Resp. 23. The Respondent-Appellant further states that because Elias died prior to judgment, "we know for certain that some events will not happen in the future." *Id*. at 24.

### i. *The Petitioners-Appellees' Response*

*Edgar* does address how compensation for impaired earning capacity pursuant to § 15(a)(3)(B) is calculated. Again, the Federal Circuit held that in the context of § 15(a)(3)(B), "age 18" is simply a factor to be applied in the calculation. "Once lost earnings are calculated using this factor, however, nothing in section 2115(a)(3)(B) permits the compensation award to be contingent upon the child reaching age 18." *Edgar*, 989 F.2d at 477.

Importantly, the Court also stated, "[N]othing in section 2115(a)(3)(B) authorizes the amount of compensation *to be contingent on the actual, post-injury life of the injured child*." *Id*. (emphasis added).[20] However, the Respondent-Appellant's interpretation of § 15(a)(3)(B) does just that; it makes compensation pursuant to § 15(a)(3)(B) contingent upon the post-injury life of Elias. The

---

[20] This rationale is consistent with traditional tort principles. *See Stein's Treatise on Personal Injury Damages* § 3.53 (3rd Ed. 2011) ("Damages for future reduced earning capacity are based upon pre-injury life expectancy.").

34

Respondent-Appellant relies on Elias' post-injury life, which ended prior to judgment, to justify a denial of compensation pursuant to § 15(a)(3)(B).

Elias received his DTaP vaccination on December 26, 2000. A48. His vaccine-injury commenced on the following day, December 27, 2000. A52. The moment that Elias' vaccine-injury commenced, his pre-injury life ceased and his post-injury life began. Elias' post-injury life ended prematurely on November 17, 2007. An interpretation of § 15(a)(3)(B) that would deny compensation for impaired earning capacity to a vaccine-injured minor who dies of his vaccine-injury prior to judgment, is in direct conflict with the holding in *Edgar*, because it would condition compensation provided by § 15(a)(3)(B) on the post-injury life.[21]

The Respondent-Appellant's interpretation is also refuted by this Court's decision in *Figueroa v. Secretary of HHS*. In *Figueroa*, the Federal Circuit stated:

> [A]s explained in our en banc decision in *Cloer I*, the Vaccine Act enshrines a principle of equal treatment for similarly situated vaccine-injured persons. . . .The government's reading of the Act would instead treat similarly situated parties quite differently, based on the unforeseeable 'personal circumstances' of an independent illness or injury. If two individuals received the same vaccine on the same day, experienced the same nonfatal complications, and sought identical compensation, but died of accidents within days of one another – one the day before filing a petition, and the other the day after – the estate of the person who had not yet filed could recover nothing, while the

---

[21]   As the court in *Foulk v. Secretary of HHS*, No. 90-4016V, 1993 WL 189960 (USCFC Spec. Mstr. May 17, 1993), stated, "Payment [pursuant to § 15(a)(3)(B)] cannot be contingent on [petitioner's] survival *beyond the entry of judgment*." *Id*. at 6 (emphasis added).

other estate would receive the maximum injury benefit allowable under the Act. This makes no sense. Moreover, if *neither* party filed a petition before dying, but the first died of an accident and the second died some time later of vaccine-related complications, the first person's estate would recover nothing, while the second person's estate would recover injury compensation and death benefits. Again, this makes no sense. It is illogical to attribute to Congress a purpose to deny some claimants compensation while allowing compensation for others who suffer identical vaccine-related injuries.

*Figueroa*, __ F.3d__, 2013 WL 1811018 at *4 (Fed. Cir. 2013).

This rationale is particularly applicable to the instant case. Under the Respondent-Appellant's interpretation, a vaccine-injured minor who dies of his vaccine-injury one day *after* Judgment, would be entitled to receive full compensation for his impaired earning capacity.[22] However, a vaccine-injured petitioner who dies shortly *before* Judgment, would be entitled to *zero* compensation for impaired earning capacity. Congress certainly could not have intended such a result and, as this Court has stated, this outcome "makes no sense." *Id*.

### C. The Respondent-Appellant Argues That Because The Secretary's Interpretation Of § 300aa-15(a)(3)(b) Is "Plausible," The Doctrine Of Sovereign Immunity Precludes The Award Of Lost Future Earnings To Elias' Estate

The Respondent-Appellant argues that unless a waiver of sovereign immunity is "unequivocally expressed," in a statute, the least restrictive

---

[22] Assuming the Court decides that his or her vaccine-injury is of sufficient severity.

interpretation should prevail.  Resp. 25.  The Respondent-Appellant also argues

that their interpretation is, at least, plausible, and therefore must be adopted.  *Id*.

### 1.    The Petitioners-Appellees' Response

The Respondent-Appellant's interpretation of § 15(a)(3)(B) is not plausible

and is in direct conflict with the plain language of the Vaccine Act, as well as

binding Federal Circuit precedent.  In this regard, Congressional intent that the

estate of a deceased minor shall receive compensation for his or her impaired

earning capacity is unequivocally expressed in the statute.  Any other interpretation

strains the plain language of the Vaccine Act beyond comprehension, and is

therefore not plausible.

Moreover, nowhere does Congress suggest that the Vaccine Program is a

waiver of sovereign immunity.  Instead, Congress said, "the new Federal

Compensation Program substitutes a Federal insurance system for the existing

State-law tort and private insurance system, as applied to vaccine manufacturers"

(emphasis added).  *See* Joint Committee on Taxation, *Issues Arising in the*

*Determination of an Appropriate Funding Source for the National Vaccine Injury*

*Compensation Program* (JCS-4-87), March 5, 1987, page 2.  This "Federal

insurance system," Congress stated, would "likely. . .eliminate the perceived threat

to compliance with the immunization program by lessening pressure for price

increases by providing greater certainty of compensation for injuries (e.g. through

specified amounts and lower standards of proof necessary for recovery). . . ." *Id*. at 3.  In this regard, the Vaccine Act does not authorize suit against the United States. Rather, it was designed as a no-fault compensation program, funded exclusively by excise taxes on vaccinations.[23]  This tax revenue goes not into the general Treasury, but into the Vaccine-Injury Compensation Trust Fund.

It is also noteworthy that Congress clearly distinguished a petition in the Vaccine Program from a lawsuit against the federal government.  Thus the Vaccine Act states, petitions for compensation must be served upon the Secretary of Health and Human Services.  § 11(a)(1).  The Vaccine Program is then "to be administered by the Secretary. . . ." § 10(a).  The Vaccine Act, then, is not a waiver of sovereign immunity to be strictly construed.  It is legislation that established a no-fault compensation program.  The statute must be broadly construed to achieve the goals of Congress.

However, even if this Court were to view the Vaccine Act as a waiver of sovereign immunity, the plain language of § 15(a)(3)(B) is unambiguous.  *See* A70 ("[T]he question of sovereign immunity. . .does not arise where, as here, congressional intent to waive it is clear."); *see also Zatuchni*, 516 F.3d at 1323.

---

[23]  The Vaccine Program is **not** funded by the general treasury.  Instead, Congress decided, "A tax is to be imposed on the sale of. . .vaccines. . . .The taxes are set to generate sufficient annual income for the Fund to cover all costs of compensation . . . .The taxes are set at different rates among vaccines to reflect the currently accepted views regarding relative reactogenicty of vaccines."  H.R. Rep. No. 908, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6375.

Moreover, the Vaccine Act is remedial legislation that must be construed broadly. *See Cloer v. Secretary of HHS*, 675 F.3d 1358, 1362 (Fed. Cir. 2012) (Pet. for Cert. granted); *See also Figueroa v. Secretary of HHS*, __ F.3d __, 2013 WL 1811018 (Fed. Cir. 2013).  As the House Committee on Government Reform stated, "The committee is concerned that the doctrine [of sovereign immunity] should be applied in an appropriate manner, consistent with the remedial purposes of the [Vaccine] Act."  H.R. Rep. No. 977 at 14.  Application of the canon of sovereign immunity to deny the estate of a minor who died as a result of his vaccine-injury would thwart Congressional intent, and would be inconsistent with the Act's remedial purpose.

In *Burch v. Secretary of HHS*, No. 99-946V, 2010 WL 1676767 (USCFC Spec. Mstr. Apr. 9, 2010), the court discussed sovereign immunity in the context of remedial legislation.  The court discussed the 1990s rulings on sovereign immunity, and how those rulings strictly applied the canon so that the narrowest interpretation of a statute prevailed.  *Id*. at 4-5 (cited cases).  The court than discussed the Supreme Court's recent ruling in *Richlin Security Service Co. v. Chertoff*, 553 U.S. 571, 128 S.Ct. 2007, 170 L.Ed.2d 960 (2008).  Specifically, that the Supreme Court in *Richlin* adopted the broader of two interpretations of a statute, thus representing a relaxation of the "narrow construction" principle.  *Id*. at 5-6.  The Court in *Richlin* also stated, "The sovereign immunity canon is just that –

a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction." *Richlin*, 553 U.S. at 589. In this regard, this Court is not bound to adopt the Respondent-Appellant's interpretation just because it is "plausible." Rather, the Petitioners-Appellees' interpretation should be adopted as it is most consistent with the statute, the remedial nature of the Vaccine Program, and this Court's precedent. Indeed, it is the only plausible interpretation of the plain language of § 15(a)(3)(B).

## VII.  CONCLUSION

The Special Master and Senior Judge Merow correctly decided that the plain language of the Vaccine Act provides compensation for impaired earning capacity to the estate of a deceased minor vaccinee. The Petitioners-Appellees respectfully ask this Court to uphold the rulings of the Special Master and the Court of Federal Claims and to award compensation to Elias' estate in the amount of $1,084,955.61, comprised of $659,955.61 pursuant to § 15(a)(3)(B); $250,000 pursuant to § 15(a)(2); and, $175,000 pursuant to § 15(a)(1)(B) and § 15(a)(4).

DATED:  May 9, 2013

Respectfully submitted,


 /s/ Ronald C. Homer
Ronald C. Homer
Counsel for Petitioners-Appellees
Conway, Homer & Chin-Caplan, P.C.
16 Shawmut Street
Boston, MA  02116
Phone:  (617) 695-1990
Fax:  (617) 695-0880

# United States Court of Appeals
## for the Federal Circuit

HARRY TEMBENIS v SECRETARY OF HEALTH AND HUMAN
No. 2013-5029

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age

of 18, upon my oath depose and say that:

Counsel Press was retained by CONWAY, HOMER & Chin-Caplan, P.C.

Attorneys for Petitioners-Appellees to print this document. I am an employee of

Counsel Press.

On **May 9, 2013**, Counsel for Appellees has authorized me to electronically

file the foregoing **Brief of Petitioners-Appellees** with the Clerk of Court using the

CM/ECF System, which will serve via e-mail notice of such filing to any of the

following counsel registered as CM/ECF users:

Michael E. Robinson
Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
202-514-1371
michael.robinson@usdoj.gov

Ryan D. Pyles
Department of Justice
Torts Branch, Civil Division
P.O. Box 460
Ben Franklin Station
Washington, DC 20044-0460
202-616-9847
ryan.pyles@usdoj.gov

Michael S. Raab
Office of the United States Attorney, WD WA
Appellate Staff, Civil Division
700 Stewart Street, Room 7237
Seattle, WA 98109
202-514-4053
michael.raab@usdoj.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

May 9, 2013                                               /s/Robyn Cocho
                                                         Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains 9,690 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

     The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2002 in a 14 point Times New Roman font or

     The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_____ font.

May 9, 2013             /s/ Ronald C. Homer
                        Ronald C. Homer
                        Counsel for Petitioners-Appellees

44